# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 25-480 |
| CHINEDU EKUMA | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

From August 2020 to March 2023, defendant Chinedu Ekuma was part of a scheme to defraud victims out of over $1.7 million dollars through various Internet scams. The fraud victims were led to believe that they were paying individuals or businesses to which they owed money; instead, the victims' money was going to bank accounts operated by the defendant. After receiving the fraud money, the defendant quickly transferred large portions of the money to his co-schemers and kept approximately $40,000 for himself. To carry out the scheme, the defendant made false statements to the banks administering his accounts—falsely telling them that the victims did, in fact, owe his companies money—and false statements to a victim who questioned where her money went after it was deposited into an account controlled by the defendant.

For these reasons described below, the government recommends a sentence of incarceration near the low end of the 27- to 33-month advisory guidelines range, absent any basis for a departure addressed in the supplemental sealed attachment to this sentencing memorandum. The government also requests that the Court impose at least two years of supervised release, restitution in the amount of $1,751,923, and forfeiture of $40,000.

**I.      PROCEDURAL HISTORY**

On November 2, 2025, the government filed a two-count Information charging the defendant with two counts of wire fraud, in violation of 18 U.S.C. § 1343.  (ECF No. 1.)  On November 18, 2025, the defendant pled guilty to both counts pursuant to a plea agreement.

**II.     SENTENCING CALCULATION**

   A. **Statutory Maximum Sentences**

The statutory maximum penalties for each of Counts One and Two (wire fraud) are 20 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.   The total maximum sentence is 40 years' imprisonment, a 3-year period of supervised release, $500,000 fine, and a $200 special assessment.

   B. **Sentencing Guidelines Calculation**

The PSR correctly calculates the defendant's applicable advisory guideline range as 27 to 33 months' imprisonment (total offense level 18 and criminal history category I).

The Probation Office calculated the defendant's offense level as follows:

- The base offense level offense is 7 (USSG § 2B1.1(a)(1)).

- 16 points are added because of actual loss between $1.5 million and $3.5 million (USSG § 2B1.1(b)(1)(I)).

- 2 points are added because the offense involved 10 or more victims (USSG § 2B1.1(b)(2)(A)(i)).

- 2 points are subtracted due to the defendant's minor role in the offense (USSG § 3B1.2(b)).

- 3 points are subtracted for acceptance of responsibility and timely plea (USSG §

3E1.1).

- 2 points are subtracted due to the defendant having 0 criminal history points (USSG § 4C1.1).

C. <u>**Analysis of 18 U.S.C. § 3553(a) Factors**</u>

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. This Court must also consider all of the sentencing considerations set forth in Section 3553. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553. The relevant § 3553 factors will be discussed in turn.

1. <u>The Nature and Circumstances of the Offense</u>

This case involves very serious criminal conduct. The defendant participated in a scheme to defraud businesses and individuals. The scheme involved another member of the

scheme pretending to be a legitimate vendor to which a victim owed money or a legitimate person to whom a victim owed money, and telling the victim to send money to a bank account controlled by the defendant. Several of the 13 victims were led to believe their money was being used for investment opportunities (which turned out to be nonexistent) and several more were victims of romance/friendship scams. The defendant's primary role in the scheme was to open a series of bank accounts and then quickly transfer the fraud money to his co-schemers after it was deposited into the accounts, so that the money could not be recovered by the victims after learning that they had been defrauded. In total, bank accounts controlled by the defendant received approximately $1,751,968 from 13 victims. An additional $653,374 in fraud money was deposited into accounts controlled by the defendant, but the transactions were never completed, mostly due to banks catching the fraud before the transactions cleared.

The defendant opened 13 bank accounts in the name of his companies Intelaris Solutions, LLC ("Intelaris Solutions") and Verge Capital ("Verge Capital"). In April and May 2021, TD Bank and Wells Fargo Bank advised the defendant that two of his accounts were being used to receive payments from fraud victims. In response to Wells Fargo, the defendant falsely stated in a fax that he had "reached out" to the victim, "confirmed that [the victim] has not authorized any recall on the payment," and provided an invoice falsely representing that the victim owed $7,950 to Intelaris Solutions for "Technological Services," when, in fact, Intelaris had not provided any services to the victim. In response to TD Bank, the defendant requested that the account be kept open. After being told that his accounts were used to receive fraud money, the defendant continued to open bank accounts and receive money from fraud victims through those accounts.

The defendant also carried out the fraud scheme by making incomplete or inaccurate statements he knew to be false and could be perceived as false by a victim or banks. For example, from or about May 25, 2021 to on or about June 7, 2021, after Intelaris Solutions' PNC Bank account ending 2665 received from a fraud victim a wire of approximately $1,206,000 on or about May 18, 2021, the defendant transferred most of the funds to Verge Capital's PNC account ending 1307 and, from that account, to bank accounts associated with other co-schemers. On or about May 12, 2022, during a recorded phone call with the fraud victim, the defendant made numerous statements to the fraud victim that were incomplete or inaccurate, including that: (i) when asked why the money was sent to Intelaris, the defendant stated that Intelaris had a money servicing business that was licensed to collect funds for clients, when, in fact, Intelaris Solutions was not a licensed money transmitter; and (ii) the defendant did not have information regarding the identity of the individual(s) to whom the victim's money was transferred, when, in fact, the defendant transferred the victim's money to his co-schemers.

Additionally, on or about August 16, 2021, the defendant sent an email to a representative of PNC Bank, which had frozen Verge Capital's PNC account ending 1307 and Intelaris Solutions' PNC account ending 2665 due to alleged fraudulent activity. In the email, the defendant requested that PNC Bank unfreeze the accounts, even though the accounts were used to accept payments from fraud victims who did not have any legitimate relationship with Intelaris Solutions and Verge Capital.

To be sure, the defendant did not create this fraud scheme, seek out the victims, or profit to the same extent as his co-schemers. As a result, the guidelines include a two-level offense level reduction for the defendant being a minor participant in the offense. Nevertheless,

5

Internet-based fraud schemes cannot operate without individuals like the defendant, who are willing to open bank accounts in the United States (which have the air of legitimacy and, thus, cause victims to believe that their money is going to the correct place), accept fraud proceeds, and transfer the money to the front-line schemers.

2. The History and Characteristics of the Defendant

The defendant has several collegiate degrees and worked as chemist or college professor for most of his adult life. (PSR ¶¶ 70, 73, 74.) He does not have any prior criminal history. This is accounted for in the guidelines range, because he is in the lowest criminal history category and receives the two-level reduction in his offense level for a zero-point offender.

The defendant accepted guilt early in this case. He agreed to speak voluntarily with the FBI in November 2023. After being advised of the investigation, he retained defense counsel and later agreed to plead guilty pursuant to an Information. As a result, the government never had to present its case to a grand jury, and the Court did not need to preside over what would have been a lengthy and complicated trial or rule on any pretrial or posttrial motions. The defendant's early guilty plea allowed the government and Court to allocate their resources efficiently during the pendency of this case.

3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

There is a strong need for the Court's sentence to promote respect for the law, reflect the seriousness of the offense, and provide just punishment for the offense. As the Court can see from the victim impact statements, these types of crimes take a significant financial, emotional, and mental toll on victims. PSR ¶¶ 30–35. A sentence of incarceration would be appropriate

punishment for individuals like the defendant who provide the access to United States bank accounts, which are necessary for Internet fraud schemes to proliferate.

### 4. The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

There is also a need for both specific and general deterrence. Internet-based fraud is rampant in today's society. Many of the criminal investigations into this conduct do not result in arrests, often because the perpetrators are located overseas. A sentence of incarceration will send the right message to other fraudsters that this type of conduct will result in a significant penalty.

More generally, to a white-collar defendant, a sentence of probation or home detention, fines, and restitution is the cost of doing business. A sentence of incarceration would go a long way toward deterring this defendant from committing another crime. The government believes that if the defendant knew that he would go to jail for his crimes, he never would have engaged in the fraud scheme. That is effective deterrence and that is why a sentence of incarceration is needed here. As courts have recognized, general deterrence is of paramount importance for white-collar offenses:

> Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crimes therefore can be affected and reduced with serious punishment.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (*quoting* Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)).

5. **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The government is unaware of any need to adjust the defendant's sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

6. **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct**

Generally, the need to avoid unwarranted sentence disparities weighs in favor of imposing a sentence within the advisory guidelines range. In fashioning the Sentencing Guidelines, the Sentencing Commission sought not only to achieve consistent sentences for similar white-collar crimes, but also to eliminate disparities in sentencing between white-collar offenses and equally serious non-white-collar offenses. As former Justice Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 20 (1988).

Eliminating unwarranted sentencing disparities not only makes the criminal justice system fairer, but it also promotes respect for and faith in the law. *See* 18 U.S.C. § 3553(a)(2)(A). Simply put, when the public sees a defendant who has committed a serious white-collar offense

walk away without a commensurate punishment, it fosters the belief that two systems of justice exist: one for the advantaged and one for the disadvantaged. *See United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class.").

  7. <u>The Need to Provide Restitution to Any Victims of the Offense</u>

The defendant is required to pay restitution to the 13 identifiable victims.

**D. <u>Supervised Release</u>**

Pursuant to USSG §§ 5D1.1 and 5D1.2, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

The government requests a term of supervised release of at least two years. While the defendant does not have a criminal record, the conduct was serious and further supervision after release from custody is warranted to aid his reentry to society and protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays any remaining forfeiture amounts. This assessment also supports imposition of all the mandatory and standard conditions of supervised release listed in USSG § 5D1.3 in addition to the special condition regarding access to financial information (USSG § 5D1.3(b)(3)(C)), given the defendant's restitution and forfeiture obligations.

### III. CONCLUSION

The government's recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Francis A. Weber*
FRANCIS A. WEBER
Assistant United States Attorney

Date: March 5, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Sentencing Memorandum was served by ECF and email upon the following:

Margaret M. Grasso, Esq. (maggie@maggiegrassolaw.com)


                                      */s/ Francis A. Weber*
                                      FRANCIS A. WEBER
                                      Assistant United States Attorney


Date:   March 5, 2026