**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **:** |
| | **:** |
| **vs.** | **: CRIMINAL NO. 25-480** |
| | **:** |
| **CHINEDU EKUMA** | **:** |

<u>**SENTENCING MEMORANDUM OF DEFENDANT CHINEDU EKUMA**</u>

## I.    INTRODUCTION

Defendant Chinedu Ekuma ("Mr. Ekuma") stands before the Court as a highly educated, accomplished, and otherwise law-abiding individual whose life has been defined by scholarship, professional service, devotion to family, and moral responsibility. His conduct, while serious and deserving of accountability, represents a singular and profound lapse in judgment against a backdrop of decades of exemplary academic achievement, community contribution, and personal integrity. He has accepted responsibility, expressed genuine remorse, and has already suffered severe professional, financial, and reputational consequences, including the loss of his tenured professorship and the enduring stigma of a felony conviction. Under these circumstances, a period of probation, coupled with the substantial collateral consequences he will carry for life, would be sufficient to promote respect for the law, provide just punishment, and deter future misconduct, while avoiding a sentence greater than necessary for an individual who poses no danger to the public and has otherwise lived an extraordinary and productive life.

## II.    PROCEDURAL HISTORY

On November 5, 2025, Mr. Ekuma was charged in a two-count indictment with wire fraud in violation of 18 U.S.C. §1343 (Counts One and Two). On November 18, 2025, the Mr. Ekuma waived prosecution by indictment and pled guilty to Counts One and Two. Mr. Ekuma has agreed to forfeit the sum of $40,000 and acknowledges that full restitution totals $1,751,923. Mr. Ekuma

has been on pretrial release since November 2025 and has been compliant with all conditions of release.

## III.    THE NEW TWO-STEP SENTENCING PROCESS UNDER THE 2025 GUIDELINES MANUAL

On November 1, 2025, the United States Sentencing Commission implemented a major structural revision to the Guidelines Manual, expressly reorganizing it to reflect what the Supreme Court has required since *United States v. Booker*, 543 U.S. 220 (2005): that federal sentencing consists of two analytically distinct steps, and that the Guidelines are only the first step in a broader inquiry governed by 18 U.S.C. §3553(a). The Commission's new Introductory Commentary makes clear that the 2025 Guidelines Manual is designed not as a prescriptive sentencing code but as a framework subject to the primacy of the statutory "parsimony principle"—a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See USSG Ch.1, Pt. A. intro. comment.

The Introduction states: "The Guidelines Manual is structured to reflect the advisory sentencing scheme established following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), recognizing both essential steps of the court's inquiry in imposing a sentence 'sufficient, but not greater than necessary.'… The guidelines and policy statements… represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)."  USSG, Ch.1, Pt. A. intro. comment.

This structural revision is not merely cosmetic. It codifies nearly two decades of Supreme Court jurisprudence emphasizing that the Guidelines, while still the "starting point," no longer predominate in the selection of the appropriate sentence. The revised Manual thus reinforces that sentencing courts are obligated to perform two separate tasks:

### A.    Step One: Properly Calculate the Advisory Guideline Range

The first step is unchanged: the district court must begin by correctly calculating the advisory guideline range. *Booker* held that this calculation remains a mandatory component of sentencing procedure, even though the Guidelines themselves are not binding. *Booker*, 543 U.S. at 264. As the Background to §1B1.1 explains: "District courts are first required to properly calculate and consider the guidelines when sentencing.… 'The district courts, while not bound to apply the Guidelines, must… take them into account when sentencing.' USSG §1B1.1, comment. (backg'd), citing *Booker*, 543 U.S. at 264."

The Supreme Court has repeatedly reaffirmed this requirement:

- *Gall v. United States,* 552 U.S. 38, 49 (2007*)* (citing *Rita v. United States*, 551 U.S. 338, 347-348(2007): "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.")
- *Gall v. United States*, 552 U.S. 38, 49 (2007): "[t]he Guidelines are the "starting point and initial benchmark."
- *Peugh v. United States*, 569 U.S. 530, 541–42 (2013): "the federal system adopts procedural measures intended to make the Guidelines the 'lodestone' of sentencing."

The 2025 Manual continues to require that the court calculate the Base Offense Level, apply any Chapter Two and Three adjustments, determine the criminal-history score, apply any statutory constraints, and determine the final advisory range. See USSG §1B1.1(a).

**B.    Step Two: Independently Apply § 3553(a) to Determine the Sentence That Is "Sufficient, but Not Greater Than Necessary"**

Once the advisory range is calculated, the court must then proceed to the second, statutorily mandated step: the application of the §3553(a) factors to determine the sentence that satisfies the parsimony principle. As §1B1.1's Background now states: "District courts are then required to fully and carefully consider the additional factors set forth in 18 U.S.C. § 3553(a)… Step two… reflects this step of the sentencing process." USSG §1B1.1 comment. (backg'd).

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(a)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(b)    to afford adequate deterrence to criminal conduct;
(c)    to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, any pertinent policy statement, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  See 18 U.S.C. §3553(a).

In exercising its sentencing discretion, the court is ultimately guided by the statutory factors, rather than being bound by the Guidelines. The Guidelines are "one factor among several." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The 2025 revisions formalize this by restructuring the Manual to place the Guideline calculation in Step One and the §3553(a) analysis in Step Two, reinforcing what has long been true: the correct sentence is the one that is individualized, holistic, and not driven mechanically by the Guidelines grid.

C.    **The Elimination of Departures and the Reaffirmation of Individualized Sentencing**

One of the most significant 2025 changes is the removal of all "departure" provisions from Chapters Four and Five.[1] Historically, the Guidelines included dozens of "departure" mechanisms, that allowed a court to impose a sentence outside the guideline range before turning to §3553(a). But after *Booker*, courts largely abandoned departures in favor of "variances," which arise from the §3553(a) analysis itself.

The Commission explained: "In 2025, the Commission amended the Guidelines Manual to remove departures… to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures… The Commission envisioned and framed this 2025 amendment to be outcome neutral… [J]udges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts… as a variance under 18 U.S.C. §3553(a)." USSG, Ch.1, Pt. A. intro. comment.

"The removal of departures… does not limit the information courts may consider in imposing a sentence nor does it reflect a view… that such facts should no longer inform a court." The Commission is explicitly acknowledging that:

- *all* formerly departure-eligible circumstances remain fully cognizable under § 3553(a);
- the sentencing court may consider any relevant, reliable information, including information about the defendant's health, family responsibilities, substance-abuse history, trauma, lack of criminal history, aberrant conduct, and other individualized factors—even if they were previously "discouraged" or "not ordinarily relevant";
- the decision whether and how to vary from the advisory range lies squarely within the district court's discretion, guided by §3553(a)'s statutory command, not by any "departure" rubric.

See 18 U.S.C. §3553(a) (setting forth the statutory framework requiring an individualized sentence that is "sufficient, but not greater than necessary"), 18 U.S.C. §3661 ("[n]o limitation shall be placed on the information" a court may consider at sentencing); *United States v. Booker*, 543 U.S.

---

[1] The sole exception is the remaining portion of §5K1.1, which no longer employs the term "departure," but instead authorizes a "reduction" resulting in "a sentence below the otherwise applicable guideline range." USSG §5K1.1

220, 245–46 (2005) (holding Guidelines advisory and restoring full judicial discretion to consider all §3553(a) factors when selecting a sentence); *Gall v. United States*, 552 U.S. 38, 49–50, 57 (2007) (the Guidelines are the "starting point," but district courts must tailor sentences to the defendant; variances may rest on individualized factors and need not be tied to Guideline departures); *Rita v. United States*, 551 U.S. 338, 351 (2007) (sentencing courts must begin with the correct Guideline range but then conduct an independent, individualized assessment under §3553(a)); *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007) (courts may vary based on policy disagreements with the Guidelines as well as individualized factors; the Guidelines do not bind the court's discretion); *Pepper v. United States*, 562 U.S. 476, 489–91 (2011) (sentencing judges may consider the "widest possible breadth of information" about the defendant, including personal history, rehabilitation, trauma, and other individualized factors; §3661 bars limitations on information considered at sentencing); *Nelson v. United States*, 555 U.S. 350, 351 (2009) (the Guideline range cannot be presumed reasonable; courts must make an independent determination under §3553(a)); *Peugh v. United States*, 569 U.S. 530, 541–42 (2013) (even in the advisory regime, the Guidelines remain only the "lodestone" and starting point; ultimate sentence must be justified by § 3553(a)); USSG, Ch.1, Pt. A. intro. comment. (eliminating departures; explaining that the amendment is "outcome neutral"; and expressly stating that facts formerly supporting departures remain fully available to courts as variances under § 3553(a), and that removal of departures "does not limit the information courts may consider").

By placing all mitigation analysis under §3553(a), the 2025 Manual restores sentencing to what Congress intended in the Sentencing Reform Act: an individualized process in which judges weigh all relevant facts to reach a fair, just, and parsimonious sentence.

### D. The Guidelines Inform; § 3553(a) Decides

The result of these reforms is a sentencing structure that is more transparent, more coherent, and more aligned with controlling Supreme Court authority. The Guidelines calculation remains important, indeed, required, but its role is only one part of a broader, individualized analysis.

The Commission emphasizes that sentencing courts remain free to consider the full universe of mitigating information, noting that the 2025 amendments "do[es]not limit" what courts may consider. This reinforces that the Guideline range acts as a reference point; §3553(a) governs the ultimate sentence; and individualized justice, not grid-driven uniformity, is the touchstone of the post-Booker sentencing system.

In short, the 2025 Guidelines Manual reflects a sentencing system that is consistent with what the Supreme Court envisioned: a system in which the court uses the Guidelines as a starting point, but where the final sentence is driven by human facts, individual circumstances, and the statutory parsimony principle.

## III.    DETERMINING CHINEDU EKUMA'S SENTENCE UNDER THE NEW TWO-STEP PROCESS

### A.    CHINEDU EKUMA'S GUIDELINE CALCULATION

*1. The Presentence Report Guideline Calculation*

The Presentence Investigation Report ("PSR") calculates the advisory guideline range as follows: Counts One and Two group for guideline purposes pursuant to U.S.S.G. §3D1.2(d) because the offense level is determined largely on the basis of the total amount of loss. The base offense level for a violation of 18 U.S.C. §1343 is 7 pursuant to U.S.S.G. §2B1.1. The actual loss is $1,751,923, resulting in a 16-level increase pursuant to U.S.S.G. §2B1.1(b)(1)(I), as the loss exceeded $1.5 million but was less than $3.5 million. Because the offense involved 10 or more victims, an additional 2 levels are added pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i). (PSR¶38-43).

Because Mr. Ekuma played only a minor role in the scheme, 2 levels are deducted pursuant to U.S.S.G. §3B1.2(b). Mr. Ekuma receives a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and (b), and because he qualifies as a zero-point offender pursuant to U.S.S.G. §4C1.1, an additional 2-level reduction applies. The total offense level is therefore 18. (PSR¶44-50)

Mr. Ekuma has no prior juvenile or adult convictions. The total criminal history score is zero, resulting in a Criminal History Category I. (PSR¶51-53) The advisory guideline range for a total offense level of 18 and Criminal History Category I is 27 to 33 months of imprisonment. (PSR¶81).

Mr. Ekuma agrees with the guideline calculation as stated in the PSR, but that is but the first step in this Court's determination of a sentence that is "sufficient, but not greater than necessary."

**B.    APPLICATION OF THE §3553(a) FACTORS TO CHINEDU EKUMA**

**1.  Nature and Circumstances of the Offense**

Mr. Ekuma fully acknowledges the seriousness of his conduct and expresses sincere remorse for the harm caused. He recognizes that his actions imposed significant financial loss and emotional distress on the victims, including the loss of savings and the substantial anxiety and disruption that accompanied those losses.

Mr. Ekuma owned entities known as Intelaris Solutions, LLC and Verge Capital. He opened bank accounts in the names of Intelaris and Verge Capital, which were used to obtain funds from individuals and businesses through false representations made over the telephone and the internet. He then transferred the majority of the proceeds to other participants in the scheme. Mr. Ekuma did not directly participate in the initial fraudulent communications with any

individual victims. Rather, those communications were conducted by his co-conspirators. (PSR¶8).

The co-conspirators targeted individuals and businesses who believed they were attempting to send legitimate payments for personal or commercial purposes. For example, some victims believed they were developing friendships or romantic relationships and were persuaded to send money.  Other victims were asked to lend money after being befriended. One individual was induced to provide $2 million in exchange for the promise of a multi-million-dollar line of credit. Another victim invested funds based on representations that the investment would be profitable. (PSR¶14-19). Mr. Ekuma was not involved in these front-end interactions with victims; rather, his role was limited to receiving the funds into accounts held in the names of his companies.

When financial institutions began questioning the transactions, Mr. Ekuma made incomplete or inaccurate statements to banks, that he knew were false or could reasonably be perceived as false. He also had a direct conversation with one victim concerning a wire transfer of approximately $1.2 million, during which he made multiple incomplete or inaccurate representations. Finally, during his interview with federal agents, Mr. Ekuma provided incomplete or inaccurate information. (PSR¶20-27).

As reflected in the plea agreement, while not binding on the Court, the Government has agreed that Mr. Ekuma qualifies for a minor role adjustment under the Sentencing Guidelines. (PSR¶3(d), 44). This concession recognizes that Mr. Ekuma was not among the primary architects or frontline perpetrators of the scheme. Rather, the initial fraudulent solicitations, which were the direct cause of the victims' losses, were carried out his co-conspirators, who interacted directly with victims. The offense would not have occurred but for those frontline actors. Mr. Ekuma's

role, though serious and deserving of punishment, was limited in comparison and largely confined to facilitating the movement of funds after the fraud had been initiated. The Government's agreement to this adjustment underscores its acknowledgment that Mr. Ekuma's culpability is materially less than that of the individuals who conceived and executed the direct deception of victims.

Mr. Ekuma pled guilty pursuant to the Government's theory that the conduct constituted fraud and acknowledges that the evidence, at minimum, supports a finding of legally sufficient willful blindness. By waiving indictment and proceeding by information, he conserved significant judicial and prosecutorial resources. He has accepted responsibility for his conduct and expresses sincere remorse for the harm that resulted.

While the offense conduct is serious and warrants accountability, it does not define Mr. Ekuma as a person. To understand the context in which this conduct occurred, and to fashion a sentence that is sufficient but not greater than necessary, the Court must also consider Mr. Ekuma's background, character, and life history.

## 2. History and Characteristics of Chinedu Ekuma

### a. Family, Education, Employment

Mr. Ekuma, currently 45 years old, was born in Lagos, Nigeria, and is one of seven children born to Christopher and Rosaline Ekuma. His parents remained married until his mother's death in 1997, when she was only 44 years old. Mr. Ekuma describes this as the most significant loss of his life. His mother was both a homemaker and a small business owner. His father, a retired teacher, continues to reside in Nigeria and Mr. Ekuma maintains regular monthly telephone contact with his father. (PSR ¶¶ 58–59)

Mr. Ekuma has six full siblings, all of whom are professionals, including university faculty and business owners. He reports a stable and supportive childhood. His parents were loving and provided for his needs, and there was no abuse or neglect in the home. He also reports that he did not witness drug use or violence in his neighborhood growing up. (PSR¶60-61) By all accounts, his upbringing was positive and structured, laying the foundation for his later academic and professional achievements.

In 2009, Mr. Ekuma came to the United States on a student visa to pursue graduate education. He initially resided in Baton Rouge, Louisiana, where he attended Southern University and Louisiana State University, earning a master's degree in physics in 2010. He later relocated to Virginia for employment, where he purchased a home. He subsequently sold that property, and he and his wife purchased their current residence in Pennsylvania. (PSR ¶62)

Mr. Ekuma married in Nigeria in 2013. His wife is a nurse at St. Luke's University Hospital. Together they have four children, between the ages of four and twelve. (PSR ¶63) His wife described him to the probation officer as a kind and principled individual, explaining that they met while attending university, where he served as her mentor before their relationship developed into marriage. (PSR ¶64)

Mr. Ekuma is physically and mentally healthy, aside from understandable stress related to the present case. He has no history of substance abuse or excessive alcohol use. He is highly educated, holding multiple degrees from universities in both Nigeria and the United States. In addition to his master's degree in physics, he earned an associate's degree in artificial intelligence from Purdue University in 2023, and a bachelor's degree in industrial physics from Ebonyi State University in Nigeria. (PSR¶66-70)

Professionally, Mr. Ekuma has built a distinguished academic and scientific career. From 2019 through 2025, he served as a physics professor at Lehigh University, teaching both undergraduate and doctoral students while conducting research. In May 2025, he was granted tenure at the rank of Associate Professor in the Department of Physics. University records reflect that he was a highly regarded faculty member. Letters from the Senior Vice President of Academic Affairs describe him as a stellar employee and commend his efforts to secure external funding for his research. (PSR ¶73) He ultimately resigned from this position as a result of the instant offense and is now employed as an independent contractor through a staffing agency performing work for Google.

Prior to his tenure at Lehigh University, Mr. Ekuma served as a research scientist at the U.S. Naval Research Laboratory in Washington, D.C., from 2015 to 2017, and at the U.S. Army Research Laboratory in Adelphi, Maryland, from 2017 to 2019. In those roles, he provided data-driven scientific analysis in support of military research programs and held the requisite security clearance for such work. Earlier in his career, he served as a lecturer at the University of Port Harcourt in Nigeria from 2007 to 2009. (PSR ¶74)

Mr. Ekuma has actively sought employment in the artificial intelligence and technology sector and has participated in multiple interviews for positions for which he is exceptionally well qualified. Despite his credentials and experience, he has repeatedly been denied employment. He reasonably attributes these denials to background checks revealing his conviction. As a result, he is already experiencing significant collateral consequences, including substantial barriers to professional advancement in the very field for which he is trained.

Mr. Ekuma's history reflects a highly educated individual who pursued advanced scientific training, contributed to academic research, supported national defense initiatives, and maintained

strong family ties. His conduct in this case stands in sharp contrast to a lifetime of achievement, professional responsibility, and law-abiding behavior. Taken together, his personal background, stable family life, exceptional educational accomplishments, sustained professional success, and lack of any prior criminal history demonstrate that he is not the type of individual who poses a risk to the public, but rather a first-time offender whose life trajectory had been defined by scholarship, mentorship, and service until the events underlying this offense.

     *b. Character Letters*

Mr. Ekuma has a very limited family network in the United States, consisting primarily of his wife and their four children. His broader support system is largely composed of colleagues and associates from the academic community, many of whom regard him not only as a peer but as a mentor and role model. The numerous letters submitted on his behalf consistently describe a man of exceptional character, integrity, and dedication to others.

Professor Akuma Onwunta of Lehigh University, who has known Mr. Ekuma for approximately five years, describes him as a scholar of "the highest integrity, a dedicated educator, and a genuine mentor to students and junior faculty." He observed Mr. Ekuma go "above and beyond what is expected," whether guiding students after hours, offering detailed feedback on research proposals, or fostering a collegial and inclusive environment among peers. He characterizes Mr. Ekuma as considerate, conscientious, and committed to advancing both knowledge and the welfare of others. (Letter of Professor Akuma Onwunta, Exhibit 1)

Mr. Ekuma's brother-in-law, Bonaventure Chukwuebuka Ojiyi, similarly writes that he embodies "integrity, compassion, and devotion - not only to his family, but to everyone privileged to know him." He credits Mr. Ekuma with playing a pivotal role in shaping his own academic path

and describes him as a rare blend of "brilliance, humility, and humanity." (Letter of Bonaventure Chukwuebuka Ojiyi, Exhibit 2)

Diola Bagayoko, a distinguished Professor Emeritus of Physics and a recipient of the U.S. Presidential Award for Excellence in Science, Mathematics, and Engineering, writes that Mr. Ekuma was her graduate student and that she has remained in contact with him over the years. She states that he "possesses excellent interpersonal skills that rest in part on his deep respect for his fellow human being." (Letter of Dialo Bagayoko, Exhibit 3)

Dr. Benjamin O. Tayo, a professor at the University of Central Oklahoma, who worked closely with Mr. Ekuma on a collaborative NIH-funded research grant, observed his deep commitment to both scientific excellence and mentorship. Beyond his academic accomplishments, Dr. Tayo notes that Mr. Ekuma demonstrates "consistent honesty, fairness, and respect in his interactions" and is deeply devoted to his students, colleagues, and family, "embodying values of service and responsibility." (Letter of Dr. Benjamin O. Tayo, Exhibit 4)

Dr. Bao Wang, professor at the University of Utah, who collaborated with Mr. Ekuma on a Department of Energy–funded research project, emphasizes his intellectual rigor and humility. He describes Mr. Ekuma as a colleague of "deep character and empathy" who is "consistently respectful, generous with his time, and genuinely invested in the success of those around him-especially students and early career researchers." He further attests that Mr. Ekuma is a person of "honor and reliability." (Letter of Dr. Bao Wang, Exhibit 5)

Mr. Ekuma's older brother, Emmanuel Ekuma, writes that Mr. Ekuma has long been "the pillar of support to our family," consistently assuming responsibility for the welfare of siblings, parents, and extended relatives. He emphasizes that, beyond academic success, Mr. Ekuma's defining trait is "service." Each summer, Mr. Ekuma volunteers as a Carnegie Mellon Diaspora

Fellow, returning to Nigeria to mentor university students and guide them toward careers in science, technology, and education. He also established a youth education program in his community and personally funded school and university tuition for underprivileged students. He states that his brother is a "leader" who "inspires others through example." (Letter of Emmanuel Ekuma, Exhibit 6)

Lifang He, a former colleague from Lehigh University who collaborated with Mr. Ekuma on academic projects, states that while he was impressed by Mr. Ekuma's intellectual rigor, leadership, and sense of responsibility, what stood out most was his "humility and humanity." He writes that Mr. Ekuma consistently treats students, colleagues, and collaborators with kindness and fairness, providing mentorship that is both "compassionate and empowering." (Letter of Lifang He, Exhibit 7)

Nnatubemugo Ngwum, a professor of computer science and information technology at the Community College of Baltimore, has known Mr. Ekuma for more than two decades. He credits Mr. Ekuma with playing a pivotal role in his own development and describes him as someone who, in every setting, whether academic, professional, or personal, demonstrates "integrity, humility, and empathy." According to Professor Ngwum, Mr. Ekuma's mentorship extends beyond academic guidance; he consistently encourages "ethical conduct, community engagement, and service to others." He concludes that Mr. Ekuma is a person of "outstanding moral standing who continues to embody the values of honesty, diligence, and humanity." (Letter of Nnatubemugo Ngwum, Exhibit 8)

Archbishop Samson Mustapha Benjamin of Resurrection Praise Ministries International, a religious organization devoted to Christian faith, service, and leadership development has known Mr. Ekuma for more than ten years as a distinguished member of the ministry. Over that time, he

has observed Mr. Ekuma consistently demonstrate "exceptional character, humility, discipline, and strong moral values rooted in Christian faith." He notes that Mr. Ekuma actively participates in church responsibilities, initiatives, and community activities and serves as a positive example to other congregants. (Letter of Archbishop Samson Mustapha Benjamin, Exhibit 90)

JaneFrances Ekuma, Mr. Ekuma's wife of more than ten years, writes movingly of her husband's character within the home. She states that she loves and respects him and has known him as a man of "unwavering integrity, compassion, humility, and devotion." She describes him as the cornerstone of their family, someone who "lives his values through action" and whose "steady presence anchors" the household each day. According to her, his dedication to their children is extraordinary. He takes an active role in every aspect of their upbringing, assisting with homework and science projects, attending school plays and parent-teacher conferences, preparing meals, and ensuring the children leave the home each day with "a prayer or a smile." When she works night shifts as a nurse, he manages dinner, bedtime routines, and the morning schedule. She also notes his faithful volunteer service within their parish and his active membership in the Knights of Columbus. His compassion, she explains, extends well beyond the home; he assists others "quietly and without expectation," guided by faith and a deep respect for all people. She further observes that the present circumstances have weighed heavily on him. He has been deeply reflective, she writes, and she has witnessed genuine remorse and a sincere desire to make amends. (Letter of JaneFrances Ekuma, Exhibit 10)

Collectively, these letters present a consistent and compelling portrait of Mr. Ekuma as a man whose life has been defined by integrity, humility, service, and devotion to others. They come from a wide cross-section of individuals, academic leaders, research collaborators, family members, and friends, who have observed him over many years in both professional and personal

settings. Despite their different relationships to him, each describes the same essential qualities: a principled scholar, a dedicated mentor, a compassionate family man, and a person deeply committed to helping others succeed. The uniformity and sincerity of these accounts underscore that the conduct underlying this offense is profoundly out of character. Rather than a person driven by greed or malice, the letters depict an individual whose identity has long been rooted in education, faith, responsibility, and service. Mr. Ekuma's qualities and character strongly support the conclusion that he is unlikely to reoffend and fully capable of continuing to contribute positively to his family, his community, and society.

### C. The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Deter Future Conduct

A sentence that promotes respect for the law, provides just punishment, and affords adequate deterrence does not require a term of incarceration in this case. Mr. Ekuma stands before the Court with an unblemished record - not merely no prior convictions, but no arrests of any kind in his entire life. He is a highly intelligent and accomplished individual who has long been respected within his academic and professional communities. Since these proceedings began, he has demonstrated deep reflection and genuine remorse for his conduct. The consequences of his conviction have already been severe and immediate: he lost his coveted tenured position as an Associate Professor at Lehigh University, a role he had spent years earning, and has endured profound shame and humiliation within the academic community. While many colleagues continue to support him based on their personal knowledge of his integrity and character, the stigma of a felony conviction will follow him permanently, limiting employment opportunities and professional standing for the remainder of his life.

Mr. Ekuma poses no danger to the community, and his history makes clear that he does not require incarceration to deter future misconduct.

As an additional and powerful deterrent, Mr. Ekuma will carry a restitution obligation exceeding $1.7 million for the remainder of his life, a burden that will inevitably affect both him and his family for decades to come. This obligation is particularly significant given that both the government and the defense agree he personally profited only approximately $40,000 from the offense. The primary architects and principal beneficiaries of the scheme remain at large and, as a result, are unlikely to be meaningfully subject to joint and several liability for restitution. Consequently, Mr. Ekuma faces responsibility for an extraordinary financial burden far exceeding his personal gain, a reality that will affect him and his family for the remainder of his life and further underscores the substantial punitive and deterrent effect already inherent in this sentence. The requirement to repay such an extraordinary sum will serve as a constant, tangible reminder of this singular transgression and provides substantial ongoing deterrence without the need for incarceration.

The punishment he has already suffered and will continue to suffer constitutes a powerful and lasting deterrent, both specific and general, and a non-custodial sentence would still fully satisfy the statutory goals of respect for the law, just punishment, and deterrence.

**D. The Need to Protect the Public**

Protection of the public does not warrant a custodial sentence in this case. There is no indication that Mr. Ekuma poses any danger or ongoing risk to the community. While his conduct was serious, it reflects a grave lapse in judgment rather than a pattern of criminal or antisocial behavior. He did not personally target or interact with victims; aside from a single telephone call with one fraud victim, his involvement consisted primarily of interactions with financial institutions. Moreover, throughout the pendency of this case, he has demonstrated complete compliance with all court-imposed conditions of pretrial release, confirming his ability to abide by

rules, respect legal authority, and maintain lawful conduct. His history of stability, education, and professional achievement further indicates that he is capable of continuing to live productively within society. With appropriate supervision, he can pursue lawful employment and contribute positively to his family and community. Given his extraordinary intellectual abilities and prior record of service in academia and scientific research, Mr. Ekuma is far more likely to remain a constructive member of society than to pose any threat to it.

### E. The Need for Education, Vocational Training and Medical Treatment

The need to provide educational or vocational training, medical care, or other correctional treatment does not support a term of incarceration in this case. Mr. Ekuma is in good physical health, has no identified mental health concerns, and has no history of substance abuse requiring treatment. There are therefore no medical or rehabilitative needs that would be addressed by a custodial sentence. Nor does he require incarceration to obtain education or vocational skills. To the contrary, he is exceptionally well educated, holding advanced degrees and a record of significant academic achievement. This factor weighs strongly against imprisonment, as any punitive or rehabilitative goals can be fully accomplished through non-custodial means. A community-based sentence with appropriate restrictions would allow him to remain employed, support his family, and continue to function as a productive member of society while still satisfying the purposes of sentencing.

### V.    The Sentencing Commission's Proposed 2026 Amendments to the Guideline Range Zones Supports a Probationary Sentence with Structured Confinement

The United States Sentencing Commission has formally proposed amendments for the 2026 guideline cycle specifically aimed at expanding judicial flexibility in determining the sentence type. "[T]he Commission identified as one of its policy priorities" the "examination of how the guidelines can provide courts with additional guidance on selecting the appropriate

sentencing option (*e.g.* imprisonment, probation or fine)…" U.S. Sent'g Comm'n, Proposed Amendments to the Sentencing Guidelines (Preliminary) Supplementary Information, at 1 (Jan. 30, 2026).[2]

"The proposed amendment would retain the Guideline Manual's zone-based structure, but Part A of the amendment would provide "further guidance on determining the appropriate sentence type from among those authorized by the guidelines and emphasize the importance of this threshold determination." Part B of the amendment would "expand Zones B and C to increase the availability of sentencing options for certain defendants." U.S. Sent'g Comm'n, Proposed Amendments, *supra*, at 1, 3.

### A. The Proposed Amendment Would Expand Zone B to Include Mr. Ekuma's Guideline Range

Part B of the proposed amendment expands Zones B and C of the Sentencing Table to increase the availability of non-custodial sentencing options. Relevant here, the proposed amendment would expand Zone B to include sentencing ranges from 4 to 57 months for Criminal History Category I. U.S. Sent'g Comm'n, Proposed Amendments, *supra*, at 3.

Mr. Ekuma's current advisory guideline range is 27-33 months. Under the existing Guidelines, the range falls within Zone D, which authorizes imprisonment only. USSG§5C1.1(f). However, under the Commission's proposed restructuring, a 27–33-month range for a Criminal History Category I offender would fall squarely within the expanded Zone B framework. The proposed amended Sentencing Table, juxtaposed with the current Sentencing Table below, more clearly illustrates the scope of the newly proposed zones:

---

[2] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf

_Current Sentencing Table_                                     _Proposed Amended Sentencing Table_



The Commission expressly explained that the purpose of this expansion is to "increase the availability of sentencing options for certain defendants" and to permit courts to impose alternative sanctions where consistent with sentencing purposes. USSG §5, Part A; U.S. Sent'g Comm'n, Proposed Amendments, supra, at 11.

### B. The Proposed Expanded Zone B Would Authorize a Sentence of Probation with Structured Confinement

The new proposed §5A1.1 _Determination of the Type of Sentence_ with regard to Zone B states:

> Zone B authorizes a sentence of probation, provided that the minimum term of imprisonment specified in the guideline range is satisfied by a period of intermittent confinement, community confinement, or home detention, as provided by the schedule of substitute punishments at §5C1.1(e). In addition, Zone B provides for the sentencing options authorized in Zones C and D. See §§5B1.1(a)(2), 5C1.1(c).

U.S. Sent'g Comm'n, Proposed Amendments, §5A1.1.(a)(2).

Accordingly, the amendment to §5B1.1. would state that "[wh]ere the applicable guideline range is in Zone B" …(i.e. the minimum term of imprisonment … is at least 4 months but no more than 57 months for a criminal history category I or at least one but not more than 18 months for the other criminal history categories)"… "the court may impose probation only if it imposes a condition or combination of conditions requiring a period of community confinement, home detention, or intermittent confinement sufficient to satisfy the minimum term of imprisonment specified in the guideline range." Proposed U.S. Sent'g Comm'n, Proposed Amendments, §5B1.1, comment. (n. 1(B)).

If a defendant falls in Zone B, the sentencing court has three options: 1) sentence of imprisonment; 2) sentence of probation provided it includes a condition of probation requiring a period of intermittent confinement, community confinement, or home detention, or combination of intermittent confinement, community confinement, and home detention sufficient to satisfy the minimum period of imprisonment specified in the guideline range; or 3) it may impose a sentence of imprisonment that includes a term of supervised release with a condition that requires community confinement or home detention. USSG §5C1.1, comment. (n. 3 (A-C)).

Thus, under the proposed amendment, a defendant with Mr. Ekuma's guideline range could receive probation conditioned on a structured confinement component satisfying the minimum guideline term. The Commission provides examples illustrating precisely this type of sentencing flexibility, demonstrating that probationary sentences with confinement conditions are intended to function as punitive and guideline-compliant alternatives to full custodial sentences. *Id.*

In addition, <u>current</u> USSG 5C1.1, Application Note 9 entitled *Zero-Point Offenders in Zones A and B of the Sentencing Table* provides that if the defendant received an adjustment

22

under §4C1.1 (Adjustment for certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B, which Mr. Ekuma's would be under the new proposed amendment, "a sentence other than a sentence of imprisonment… is generally appropriate." USSG §5C1.1, comment. (n. 9).  Accordingly, if the amendment were in effect today, Mr. Ekuma's guideline range would fall within Zone B and §5C1.1 would expressly recognize that a sentence other than imprisonment is "generally appropriate."

### C. The Proposed Amendment Reflects Evolving Commission Policy Supporting Individualized Sentencing

The Commission further emphasized that non-imprisonment sentences, including probation with restrictive conditions, "serve a punitive function" and can adequately satisfy sentencing goals in appropriate cases. The amendment if enacted would reflect a clear policy judgment that broader sentencing discretion is consistent with Congress's directive to tailor punishment to the circumstances of individual defendants and to impose sentences that are "sufficient, but not greater than necessary."

### D. The Proposed Amendment Provides Persuasive Authority Supporting a Variance to a Non-Custodial Sentence

Although not yet formally promulgated, the Commission's considered policy determination that defendants with guideline ranges up to 57 months in Criminal History Category I may appropriately receive Zone B sentencing options is highly persuasive. It reflects the Commission's most recent empirical review of sentencing effectiveness and resource allocation and demonstrates that a structured non-custodial sentence for a defendant in Mr. Ekuma's range is consistent with contemporary guideline policy and evolving national sentencing practices.

## VI.    CONCLUSION

For all of the foregoing reasons, there is no sound basis to conclude that a term of incarceration is necessary in this case. The goals of punishment and deterrence have already been substantially achieved through the profound personal, professional, and reputational consequences Mr. Ekuma has endured and will continue to endure as a convicted felon, including the substantial restitution obligation. Specific deterrence is not a concern given his lifelong law-abiding history, demonstrated remorse, and the extraordinary collateral consequences he has suffered, while general deterrence can be fully served through a meaningful term of supervised probation. Imprisonment would do little to advance the interests of justice but would impose significant hardship on his four young children and his wife who would be left as their sole provider and caretaker and deprive society of the positive contributions he is uniquely positioned to provide. Mr. Ekuma can far better serve the community by applying his considerable intellect and expertise in lawful pursuits, supporting his family, and remaining a present and engaged father to his children. A probationary sentence would hold him accountable while allowing him to continue contributing constructively to society. This result is fully consistent with the statutory mandate to impose a sentence "sufficient, but not greater than necessary," to achieve the purposes of sentencing.

**Respectfully submitted,**

**LAW OFFICE OF MARGARET M. GRASSO**

*Margaret M. Grasso*

**MARGARET M. GRASSO, ESQUIRE**
**Attorney for Defendant CHINEDU EKUMA**

March 5, 2026

1



Akwum Onwunta, Ph.D.,
Assistant Professor,
Department of Industrial and Systems Engineering,
Lehigh University,



October 26, 2025.

## To Whom It May Concern

I am Professor Akwum Onwunta, currently serving as Assistant Professor in the Department of Industrial & Systems Engineering at Lehigh University. I have known Professor Chinedu Ekuma for more than five years as a professional colleague, collaborating with him on research initiatives and academic service obligations.

Over the years I have come to know Professor Ekuma as a scholar of the highest integrity, a dedicated educator, and a genuine mentor to students and junior faculty alike. His conduct in the classroom and laboratory consistently reflects fairness, respect, and intellectual rigor. I have observed his willingness to go above and beyond what is expected—whether guiding students after hours, offering thoughtful feedback on research proposals, or fostering an inclusive and collegial environment among peers.

While I am aware of the current legal matter involving Professor Ekuma, I do not presume to comment on its specifics; however, I can attest without reservation to his longstanding record of ethical behaviour, professional responsibility, and positive contributions to our academic community. The individual I know is considerate, conscientious, and committed to advancing both knowledge and the welfare of others.

I respectfully request that the Court give due consideration to Professor Ekuma's character, his scholarly and mentoring contributions, and his reputation as a person of good standing. I believe he remains a valuable member of the academic community with much to offer, and I hope that his positive attributes and past conduct may be factored into any considerations made.

Yours sincerely,

Prof. Akwum Onwunta,

2

# Character Reference Letter for Prof. Chinedu Ekuma

From:
Bonaventure Chukwuebuka Ojiyi

████████████████████████████████

██████████████████████████

Date: 11th November 2025

## To Whom It May Concern:

It is with deep respect and heartfelt appreciation that I write this letter in strong support of Professor Chinedu Ekuma, my brother-in-law, who has been a remarkable influence in both my personal and academic development. Prof. Ekuma has been married to my elder sister, Mrs. JaneFrances Ekuma (née Ojiyi), since 2015, and throughout that time he has embodied integrity, compassion, and devotion — not only to his family, but to everyone privileged to know him.

From my undergraduate years, Prof. Ekuma played a pivotal role in shaping my academic path. Beyond paying my tuition fees when I lacked financial stability, he took a sincere, hands-on interest in my education — mentoring me through complex statistics and mathematics projects, and teaching me how to think critically and work diligently. His guidance was never perfunctory; he made time to review my progress, challenge my reasoning, and encourage independent thought. I owe much of my academic confidence and discipline to his selfless mentorship.

Prof. Ekuma's character and integrity are beyond reproach. He has consistently demonstrated kindness, humility, and fairness in every aspect of his life. Since the passing of my mother in 2022, he has been an unwavering source of emotional and moral support to my family — stepping up as a true pillar, ensuring that the family remained united, comforted, and hopeful. His actions are guided by quiet strength, compassion, and a sense of duty that I find deeply inspiring.

In his professional capacity as an Associate Professor of Physics at Lehigh University, Prof. Ekuma is known for his intellectual rigor and commitment to excellence. Yet beyond his academic accomplishments, he remains grounded, approachable, and genuinely invested in the wellbeing of others. It is this blend of brilliance, humility, and humanity that defines him.

I have the highest regard for Prof. Ekuma's moral standing, professional conduct, and

personal integrity. Over the years, he has consistently demonstrated honesty, compassion, and a deep sense of responsibility toward his family and community. I hold him in the utmost respect and have complete confidence in his character and his ability to act with fairness and good judgment in all matters entrusted to him.

Sincerely,

Bonaventure Chukwuebuka Ojiyi

3

**DIOLA BAGAYOKO**

████████  ███████████████  ███████

Cell Telephone: 2████████82     Office: 2█████████77     E-mail: B███████████████

November 5 2025

**To Attorney Maggie Grasso**
(maggie@magiegrassolaw.com)

**Subject**: Character Witness Letter for Dr. Chinedu Ekuma

This communication comes to express what I know about Dr. Chiedu Ekuma, with emphasis on his character. I am a distinguished professor emeritus of Physics, with 35 years of teaching. mentoring, research, administration, and service. My physical address. telephone number, and email address are provided above. Additional information (www.subr.edu/page/3049/) is available on me at the given website. After rising through the ranks from assistant to Associate Professor, I also served as chairman of both the Department of Physics and of Mathematics and Physics. From 2015 to my retirement in June 2019, I served as the dean of the Honors College. My winning of the US Presidential Award for Excellence in Science, Mathematics, and Engineering Mentoring (US-PAESMEM) in 1996, the winning of this award by my mentoring program known as the Timbuktu Academy (www.subr.edu/TimbuktuAcademy), and my securing up to 88 sponsored projects, whose total budget was $62 Million, partly explain my titles of Chancellor's Fellow and of distinguished professor. *These few lines are meant to assert that, given my own work, I do not attribute to someone a virtue, a character, or a result that person did not factually earn.*

Mr. Chinedu Ekuma was a Master's degree graduate student of mine from 2009 to 2010. During this time, he served as my research assistant as I directed his thesis research. From 2010 to about 2015, I continued to collaborate in research with Mr. Ekuma, who was pursuing his Ph.D. degree in Physics at Louisiana State University (LSU). I was a member of his dissertation committee at LSU where I am an adjunct professor. I have stayed in touch with Dr. Ekuma to date. His area of research for his MS and Ph.D. degrees was theoretical calculations of electronic, magnetic, optical, structural, transport, and related properties of materials, with some emphasis on semiconductors.

Dr. Ekuma possesses excellent interpersonal skills that rest in part on his deep respect for his fellow human being. He works very well with others. The multitude of research collaborations he has had partly attests to this fact. Dr. Ekuma has an intrinsic desire to contribute positively to the extent of his exceptional abilities, intellectual and otherwise. His voracious learning is partly explained by his desire to hone himself and to contribute more. His positive outlook on life partly stems from his readiness to work to improve it, not just for himself, but also for others. He was a distinct role model among his peers at Southern University and at Louisiana State University (LSU)

Some of his many positive attributes include an uncommon intelligence, an exceptionally high work ethic, marvelous interpersonal skills, a profound sense of teamwork, stellar integrity, excellent communication skills, and many more. A tangible demonstration of his integrity and honesty consists of the following incident.

In 2011, while he was working on his Ph.D., Mr. Ekuma performed electronic and related property calculations for rutile Titanium dioxide (TiO$_2$). Up to this point, all the calculations done by my research group had produced results in agreement with experimental findings, for more than 25 semiconductors, particularly for the electronic energies and the crucially important band gap (i.e., the separation between the highest occupied energy level and the lowest, unoccupied energy level). For TiO$_2$, his calculated band gap disagreed not only with other theoretical findings but also with experimental results! Ekuma reported to me what he found and noted the disagreement with experimental findings. To understand the importance of this situation, one needs to know that our research group was (and still is today) the only one, worldwide, to obtain correctly the same band gaps of semiconductors as experiments, from ab-inito calculations with no adjustments. The rigorous, mathematical and physical reasons for this fact are in AIP Advances 4, 127204 (2014), a freely available publication. Ekuma and I published our findings in the Japanese Journal of Applied Physics [Japanese Journal of Applied Physics 50 (2011) 101103]. As explained in the above-identified AIP article, two years after the publication of our TiO2 paper, an experimental publication proved that we were right and that the band gap of TiO2 is an indirect one, contrary to previous theoretical and experimental findings. This incident attests to the honesty and integrity of Dr. Ekuma.

Should be a need to elaborate on any of the points made above, please contact me by phone or via an email.

Thank you very much for your attention.

_____
Diola Bagayoko

4



Dr. Benjamin O. Tayo
**Professor of Engineering & Physics**
**School of Engineering**
**University of Central Oklahoma**
**100 N University Dr**
**Edmond, OK 73034**
**Email:** ▮▮▮▮▮▮▮▮

October 25, 2025

To Whom It May Concern:

I am writing in support of my colleague and collaborator, Professor Chinedu Ekuma, whom I have known professionally since 2020. I serve as Associate Professor of Engineering & Physics at the University of Central Oklahoma, and I have had the privilege to work closely with Professor Ekuma on a collaborative, NIH-funded research grant. Over the course of our work together, I have come to know him as a person of exceptional professional integrity, scholarly dedication, and compassionate character.

When we first partnered on the grant, I observed Professor Ekuma's deep commitment to both scientific excellence and mentorship. He brought rigorous analytical thinking, unwavering work ethic, and a supportive spirit to our team. His contributions to our joint project extended beyond data and computations: he consistently prioritized the growth and engagement of junior researchers and students, ensuring that every team member felt valued and capable. One instance stands out in my memory: when a graduate student in our project encountered a major computational error late on a Friday, Professor Ekuma voluntarily stayed over the weekend to help the student debug the code and understand the underlying physics, exhibiting patience and genuine concern for the student's development rather than simply resolving the problem himself.

Beyond his technical competence, Professor Ekuma's professional conduct is exemplary. He demonstrates consistent honesty, fairness, and respect in his interactions. In meetings, he listens carefully, acknowledges others' perspectives, and acts thoughtfully—never rushing to judgment or self-promotion. He embodies the role of a leader who empowers rather than dominates. I recall a time during our collaborative work when funding logistics unexpectedly shifted; rather than deflect blame or seek shortcuts, Professor Ekuma gathered the team, openly discussed options, reassured junior members, and proposed a detailed action plan that preserved both scientific rigor and team morale. His calm, methodical, and ethical approach turned a potential crisis into a positive learning experience.

On a personal level, I have seen how Professor Ekuma balances his professional excellence with humility and kindness. He is deeply devoted to his students, colleagues, and family, consistently embodying values of service and responsibility. His character gives me full confidence in recommending him to you for consideration. I believe that any evaluation of his professional or personal life will reveal a man who leads with integrity, compassion, and quiet strength.

In conclusion, I respectfully ask that the Court give due consideration to Professor Ekuma's record of scholarly achievement, mentorship, and character. I believe he is a person of great value—both to the academic community and to those fortunate enough to call him colleague or friend. Thank you for your time and for considering my perspective.


Sincerely,

Professor Benjamin O. Tayo
Professor of Engineering & Physics
University of Central Oklahoma

5



THE
UNIVERSITY
OF UTAH

**Scientific Computing and Imaging Institute**

To whom it may concern,                                    October 29, 2025

I am writing to express my sincere support for **Professor Chinedu Ekuma** of Lehigh University. I have known Professor Ekuma since 2022, and we currently collaborate on a **Department of Energy–funded research project** focused on *novel architecture design for transferable artificial intelligence and machine learning (AI&ML)*, where he serves as the **Principal Investigator**. Through this collaboration, I have had the opportunity to observe his professional excellence, leadership, and personal integrity firsthand.

From the outset of our collaboration, I have been deeply impressed by Professor Ekuma's combination of intellectual rigor and humility. His leadership style is both inclusive and highly effective—he brings together experts across disciplines, ensuring that each perspective contributes meaningfully to the project's objectives. He approaches every technical challenge with a rare blend of creativity, patience, and analytical precision. His ability to bridge complex physical modeling with machine learning–based inference frameworks has been instrumental in advancing our project's goals.

Beyond his technical and scholarly strengths, Professor Ekuma stands out as a colleague of deep **character and empathy**. He is consistently respectful, generous with his time, and genuinely invested in the success of those around him—especially students and early-career researchers. His mentorship is marked by kindness and a clear sense of responsibility; he encourages rigorous scientific thinking. These qualities have made him an invaluable collaborator and a respected figure within the broader scientific community.

In both professional and personal contexts, I have found Professor Ekuma to be a person of **honor and reliability**. He represents the very best of academic collaboration—committed to excellence, fairness, and the collective advancement of knowledge. I have the highest regard for him and full confidence in his continued contributions to science, education, and society.

Please feel free to contact me if further information is needed.

Sincerely yours,


Bao Wang
Assistant Professor of Mathematics
Department of Mathematics

Scientific Computing and Imaging Institute
University of Utah
Email: b███████████████

6

**From:** **Ukom Ekuma** 
**Subject:** Character letter: Re Prof Chinedu Ekuma.
**Date:** November 10, 2025 at 3:23 PM
**To:** maggie@maggiegrassolaw.com
**Cc:** cekuma1@gmail.com

Emmanuel U. Ekuma

November 13, 2025

To whom It May Concern;

I write to you as Emmanuel Ekuma, elder brother of Prof. Chinedu Ekuma, and as a businessman who has known him intimately for his contributions both within our family and our broader community. It is with full conviction that I put forward this character letter on his behalf, in relation to the matters now before your court.

From the earliest days, Chinedu has been a pillar of support to our family. He has consistently borne responsibilities, not only for his own academic and professional achievements, but also for the welfare and advancement of his siblings, our parents, and extended family. His generosity has extended to helping my own business efforts and personal family needs, not because it was expected—but because he chose, with humility, to act.

His professional path is distinguished: he achieved top honours in his undergraduate studies at Ebonyi State University in Nigeria, gained a master's degree in computational condensed matter physics from Southern University, and earned a doctorate at Louisiana State University. He joined the Physics Department at Lehigh University and has earned recognition as a researcher of international calibre.

This trajectory speaks not only to his intellect but also to his discipline, perseverance, and commitment to excellence.

Yet the most compelling part of his character lies in his service. Over the past three years he has volunteered each summer, as a Carnegie Mellon Diasporan Fellow, returning to Nigeria to mentor students across universities, helping them navigate the fields of science, technology and education.

In our community, he established a youth education programme, he has personally funded school and university tuition for less-privileged students, and has led events supporting widows and young people in need. I myself participated alongside him in many of these outreach activities, witnessing his genuine concern, thoughtful planning, and hands-on involvement.

In all his dealings, Chinedu demonstrates humility. Despite being in positions of authority and expertise, he listens, he respects others, and treats everyone with dignity.

As a leader, he inspires others through example—whether that means staying late to review a student's work, or quietly providing assistance to a neighbour without fanfare. His integrity is beyond question: he honours his commitments, values truth and fairness, and has dedicated his life to enabling others to succeed alongside him.

Your Honour, while facing the current legal challenge, it is my sincere belief that Prof. Chinedu Ekuma remains an asset to his community, his family, his peers—and to society at large. He has already given so much, and I am confident he will continue to do so. I respectfully submit this letter in hope that you will see in him the same qualities I witness every day: humility, leadership, compassion, integrity—and a steadfast commitment to uplift others.

Thank you for your time and consideration. I am available at your convenience should you require any further information or testimony regarding his character.

Yours faithfully,

Emmanuel Ekuma

Grateful Heart

7



Department of Computer Science and Engineering
Building C
████████████████████████████
Web: www.cse.lehigh.edu

October 29, 2025

To Whom It May Concern,

I am writing to offer my sincere and wholehearted support for Professor Chinedu Ekuma, whom I have known since 2019 as a colleague and research collaborator at Lehigh University. My name is Dr. Lifang He, and I am an Associate Professor in the Department of Computer Science and Engineering at Lehigh University, as well as Chair of the IEEE Computer Society Chapter for the Lehigh Valley and Chair for IEEE Regions 1 and 2 – Area 3. Over the years, I have had the privilege of working closely with Professor Ekuma on academic, professional, and service-related initiatives, and I can attest without reservation to his outstanding character, integrity, and professionalism.

I currently collaborate with Professor Ekuma on a Department of Energy–funded project that focuses on new architecture design for transferable artificial intelligence and machine learning (AI&ML), where he serves as the Principal Investigator. From the earliest stages of this collaboration, I have been deeply impressed by his intellectual rigor, leadership, and sense of responsibility. He manages complex interdisciplinary teams with respect, patience, and transparency, ensuring that every voice is heard and that all contributors feel valued. His ability to bridge physics-based modeling with AI-driven innovation reflects not only his technical depth but also his vision for impactful, ethical research.

Beyond his scholarly excellence, what truly stands out about Professor Ekuma is his humility and humanity. He consistently treats students, colleagues, and collaborators with kindness and fairness, offering mentorship that is both compassionate and empowering. I have personally witnessed him spend hours guiding graduate students—both his own and those outside his group—on research design, data analysis, and career development. His approach reflects genuine care for others' growth, not self-interest.

Professor Ekuma is also an engaged member of the academic and local community. As a devout Christian and active member of the Knights of Columbus, he embodies the values of service, integrity, and fellowship. In every professional interaction, he demonstrates calmness, empathy, and a strong moral compass. He is the type of person who responds to challenges not with defensiveness but with reflection and a desire to make amends and improve.

I am aware that Professor Ekuma is currently navigating a challenging personal matter, and I have observed the sincere reflection with which he has approached it. He is a thoughtful and conscientious individual who takes responsibility seriously and demonstrates genuine introspection. It is clear that he views this experience as an opportunity for growth and renewal. I

am confident that he will continue to apply the same integrity, discipline, and sense of purpose that have long defined his professional and personal conduct.

In my professional and personal experience, few individuals embody the combination of intellectual excellence, moral integrity, and empathy that Professor Ekuma does. I hold him in the highest regard and can confidently say that he represents the best ideals of our university and the broader academic community.

Please do not hesitate to contact me if additional information or clarification is needed.


Sincerely,

Lifang He

Lifang He, Ph.D.
Associate Professor, Department of Computer Science & Engineering
Chair, IEEE Computer Society Chapter, Lehigh Valley
Chair, IEEE Regions 1 and 2 – Area 3
Lehigh University

8

From: **Ngwum, Nnatubemugo I.** n
Subject: Character Letter for Professor Chinedu Ekuma
Date: October 27, 2025 at 9:46 PM
To: maggie@maggiegrassolaw.com

**Nnatubemugo Ngwum, D.Sc., PMP, ITIL**
Professor of Computer Science & Information Technology
Community College of Baltimore County
Catonsville, MD 21228

October 27, 2025

To Whom It May Concern

**Character Letter for Professor Chinedu Ekuma**

I am writing in strong support of Professor Chinedu Ekuma, whom I have known personally and professionally for over two decades. I first met Professor Ekuma in 2004 during our undergraduate studies at Ebonyi State University in Nigeria. From that time through our present academic careers in the United States, he has been my mentor, colleague, and trusted friend.

Throughout my professional development, Professor Ekuma has played a pivotal mentoring role. His guidance and support were instrumental towards my successful transitioning to the United States to purse a doctoral study at Towson University. His example of intellectual rigor, discipline, and generosity has continued to shape my own approach to scholarship and teaching.

In every setting—academic, professional, and personal—Professor Ekuma has demonstrated exceptional integrity, humility, and empathy. He is a man of strong moral character who treats others with fairness and respect. His mentorship has never been limited to academic advice; he has consistently encouraged ethical conduct, community engagement, and service to others. I have always admired his ability to remain composed and thoughtful, even in challenging circumstances.

As a faculty member at the Community College of Baltimore County and Towson University, I attribute much of my academic outlook and professional resilience to Professor Ekuma's example. I am deeply aware of the current legal matter involving him; and while I do not speak to the specifics, I can confidently attest that the Professor Ekuma I have known for more than twenty years is a person of impeccable integrity, professionalism, and compassion. He has positively influenced countless students and colleagues through both his scholarship and character.

I respectfully urge the Court to take into account Professor Ekuma's long record of mentorship, community service, and professional dedication. His contributions to education and research have touched many lives, mine included. I believe he remains a person of outstanding moral standing who continues to embody the values of honesty, diligence, and humanity.

Sincerely,

**Nnatubemugo Ngwum, D.Sc.** *| pronouns he/him/his |*

Assistant Professor | Computer Science/Information Technology | Community
College of Baltimore County
Phone: ██████████ | Email: n██████████
*CCBC. The incredible value of education.*


*Please note: This letter is written in my personal capacity and does not represent
the views or position of CCBC*

9

# RESURRECTION PRAISE
# MINISTRIES INTERNATIONAL

**Tel:**
**Website: www.smbenjamin.org**
E-mail:

November 7, 2025

## To Whom It May Concern

My name is His Eminence Archbishop Samson Mustapha Benjamin, the Founder and General Overseer of Resurrection Praise Ministries International, a religious organization dedicated to Christian faith, service, and leadership development. I am writing this letter in reference to Professor Chinedu Ekuma, who has been a committed and distinguished member of our ministry for over 10 years.

Throughout this period, Professor Ekuma has demonstrated exceptional character, humility, discipline, and strong moral values rooted in Christian faith. He actively participates in church responsibilities, supports community initiatives, and serves as a positive example to other members through his conduct and leadership qualities. His integrity is unquestionable, and his dedication to both his faith and profession is admirable.

While I recognize there may be ongoing issues beyond the church's scope, I am not in a position to comment on their specifics. However, based on my longstanding personal and pastoral relationship with him, I can confidently affirm his good character, ethical disposition, and consistent commitment to the welfare of others. He has always shown respect, compassion, and responsibility in all his interactions within our community.

I earnestly request that you give due consideration to his record of good standing, his contributions to society, and the positive influence he continues to have on those around him. Professor Chinedu Ekuma remains a valued member of our congregation with much to offer to humanity.

Thank you for your thoughtful consideration.

Yours sincerely,

Signature: _____
**His Eminence**
**Archbishop (AMB) Samson Mustapha Benjamin**
**Founder & General Overseer**
**Resurrection Praise Ministries International**

10

**JaneFrances Ekuma**

████████████████████

████████████████████

Email: n██████████████████

Phone: ██████████████

**October 28, 2025**

**To Whom It May Concern:**

My name is **JaneFrances Ekuma**, and I am a registered nurse at St. Luke's Hospital. I am also the wife of **Professor Chinedu Ekuma**, to whom I have been happily married since December 2015. Together we are blessed with four beautiful children: Prudencia C., JaneFrances D., Trinity K.C. Jr., and Psalm L. I am writing this letter to offer my sincere and heartfelt testimony of my husband's character as the Court considers his situation.

It is difficult to put into words how deeply I love and respect my husband, but I hope this letter gives a true sense of the remarkable person he is. In more than fifteen years of knowing Chinedu—including ten years of marriage—I have come to know him as a man of **unwavering integrity, compassion, humility, and devotion**. He is the cornerstone of our family, a man who lives his values through action and whose steady presence anchors us every day.

Chinedu's dedication to our children is extraordinary. He takes an active role in their upbringing—helping with homework and science projects, attending every school play and parent-teacher meeting, preparing their meals, and making sure they never leave the house without a prayer and a smile. I work permanent night shifts at the hospital several days each week, which means Chinedu handles dinner, bedtime, and the morning routine before taking the kids to the bus stop and heading to work himself. He balances these responsibilities with grace while leading a large research group of Ph.D. students and volunteering faithfully in our parish as an active member of the **Knights of Columbus**.

One of the clearest memories of his devotion came during the height of the COVID-19 pandemic, when I was recovering from childbirth. Even while working full-time, Chinedu managed the household, cared for our newborn and the older children, and made sure we were safe, fed, and comforted. His calm strength, tenderness, and faith carried us through one of the hardest times of our lives.

Chinedu's compassion extends beyond our home. He is a man who helps others quietly and without expectation—whether it's supporting a colleague, mentoring a student, paying for school fees for vulnerable children in Nigeria, or helping a neighbor in need. He lives by faith, treats everyone with respect, and never hesitates to serve where he is needed. Those who know him, from church to the university, recognize his kindness and deep sense of responsibility.

I know that the current situation has weighed heavily on his heart. At his core, Chinedu is a gentle, caring man who believes in doing what is right. Chinedu is deeply reflective, and I have seen his genuine remorse and quiet reflection. He does not take mistakes lightly, and his desire to make amends is heartfelt. This experience has humbled him and strengthened his resolve to grow wiser and more grounded—for himself, for our family, and for the community he serves.

Your Honor, I humbly ask that you consider the man I know—one of deep compassion, honesty, and unwavering responsibility. He is a devoted husband, a loving father, and a man of faith whose integrity and kindness touch everyone around him. I believe in his good character and in his sincere desire to continue learning, growing, and giving back to those whose lives he enriches every day.

Thank you for taking the time to read this letter and for considering my words. If further information or clarification is needed, I will gladly provide it.

With sincere gratitude,

**JaneFrances Ekuma**

## CERTIFICATE OF SERVICE

I, Margaret M. Grasso, Esquire, certify that I have delivered a copy of Defendant's Sentencing Memorandum to Assistant United States Attorney Francis Weber, Esquire by electronic mail.

LAW OFFICE OF MARGARET M. GRASSO

**MARGARET M. GRASSO, ESQUIRE**
**Attorney for Defendant Chinedu Ekuma**

March 5, 2026